## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JONATHAN LEDERER and DAVID LEDERER,<br><br>                    *Plaintiffs,*<br><br>        v.<br><br>THE TRUSTEES OF COLUMBIA UNIVERSITY IN THE CITY OF NEW YORK,<br><br>                    *Defendant.* | **COMPLAINT**<br><br>Case No. _____<br><br>**Jury Trial Demanded** |

Plaintiffs Jonathan Lederer and David Lederer (together, "Plaintiffs" or the "Lederers"), for their Complaint against Defendant The Trustees of Columbia University in the City of New York ("Columbia" or the "University"), allege as follows:

## INTRODUCTION

1.     This case is about holding Columbia accountable for engaging in, condoning, and permitting severe and pervasive assault, harassment, and intimidation against the Lederers based on their Jewish identity in violation of federal and city law, as well as Columbia's contractual obligations.

2.     The Lederers are twin brothers and students at Columbia University. They present themselves as Jewish, both ethnically and religiously, in their interactions with the public.

3.     Columbia has long had an antisemitism problem. It was one of the first universities to adopt discriminatory admissions policies for the express purpose of reducing the number of Jewish students on campus. Over the years, it has hired

1

antisemitic faculty and administrators. In many respects, Columbia's *current* antisemitism problem is no surprise.

4.      Nevertheless, Columbia repeatedly promises, through published policies, practices, and procedures, to protect *all* students from harassment, intimidation, and discrimination based on their protected characteristics. Columbia also promises students protections for freedom of speech and expression.

5.      Yet Columbia has intentionally and deliberately failed to abide by those promises—as well as its obligations under federal, state, and city law—to provide Jewish students like David and Jonathan a safe educational environment free from harassment, discrimination, and intimidation.

6.      For nearly two years, David and Jonathan have been harassed and intimidated by antisemitic mobs on Columbia's campus; blocked from entering Columbia buildings by Columbia faculty, staff, and students; and treated differently than other students solely because they are Jewish. Jonathan was even assaulted— *twice*—due to his Jewish identity.

7.      Accordingly, Plaintiffs bring this action under Title VI of the Civil Rights Act, under the New York City Human Rights Law, and for breach of contract, to recover damages for and to seek injunctive relief from Columbia's hostile educational environment, disparate treatment, and discrimination against Plaintiffs, as well as its breach of contractual duties.

## JURISDICTION AND VENUE

8.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over Plaintiffs' claims arising under Title VI of the Civil Rights Act of 1964 ("Title VI") (42 U.S.C. §§ 2000d *et seq*.).

9.      This Court has supplemental jurisdiction over Plaintiffs' related state and city law claims under 28 U.S.C. § 1367(a) because those claims arise out of the same case or controversy as Plaintiffs' federal claims.

10.     This Court has personal jurisdiction over Columbia because it is based in and operates in New York, NY.

11.     Venue is proper in the Southern District of New York under 28 U.S.C. §1391(b)(2) because it is the judicial district in which a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred.

## PARTIES

12.     Plaintiff Jonathan Lederer is a Jewish student attending Columbia University. He is in his senior year of studies. He presents himself as Jewish, ethnically and religiously, in his interactions with the general public.

13.     Plaintiff David Lederer is a Jewish student attending Columbia University. He is in his senior year of studies and is Jonathan's twin brother. Together, they are sometimes pejoratively called the "Zionist Twins." Like Jonathan, David presents himself as Jewish, ethnically and religiously, in his interactions with the general public.

14.     Defendant The Trustees of Columbia University in the City of New York is the legal name of Columbia University, a private, not-for-profit university based in

New York, New York. It is composed of various graduate and undergraduate programs, including Columbia College (which Jonathan attends) and the Fu Foundation School of Engineering and Applied Science (which David attends).

15.     Columbia accepts substantial direct financial assistance from the federal government through, among other things, grants and contracts. Columbia also receives substantial indirect federal financial assistance through, among other things, tuition paid with federal financial aid.

16.     At all times relevant to this Complaint, Columbia has been and remains subject to Title VI. Columbia is also an "educational institution" and a place of "public accommodation" under the New York City Human Rights Law. *See* N.Y.C. Admin. Code § 8-102.

## FACTUAL ALLEGATIONS RELEVANT TO ALL COUNTS

### I.     Antisemitism

17.     As Jews, Plaintiffs are members of a protected class. Judaism is more than a set of common religious beliefs. Jews share a common ancestry, both through direct genealogical descent and the culture of Jewish communities through the ages. Being Jewish is an ethnic, communal, national, and religious identity.

18.     Zionism is a belief in the right of Jews to self-determine in their ancestral homeland, the land of Israel. Zionism is an integral part of Jewish belief, practice, and identity. The land of Israel is the bedrock of ancient Jewish civilization and the center of Jewish culture, holidays, and traditions. The Jewish holy book, the Torah, highlights the story of the Jewish journey towards the land of Israel, and nationhood in that land is central to Judaism. For the next two *millennia*, and

including today, Jews lived continuously in the land of Israel, under various colonizers and foreign leaders. Even though many (but not all) Jews were expelled by the ancient Romans from the land of Israel, those diaspora Jews maintained their religious and ancestral connection to the land of Israel and the hope of returning home—which many finally did in 1948. Zionism is, thus, central to Jewish identity and culture and, for many, a religious belief.

19.    It is true that not all Jews are Zionists, just as not all Jews keep kosher or observe the Sabbath. That does not change the fact that Zionism is central to Judaism. Discrimination against Jews based on their Zionist beliefs is no different than discrimination against Jews who observe the Sabbath or keep kosher.

20.    The International Holocaust Remembrance Alliance ("IHRA") defines antisemitism as a perception about Jews, "which may be expressed as hatred toward Jews. Rhetorical and physical manifestations of antisemitism are directed toward Jewish or non-Jewish individuals and/or their property, toward Jewish community institutions and religious facilities."

21.    The IHRA definition also provides examples of antisemitism, including Holocaust denial or distortion, accusations that Jews are collectively responsible for the actions of a single Jewish person or group, denying Jews "their right to self-determination, e.g., by claiming that the State of Israel is a racist endeavor," and applying double standards to the State of Israel.

22.    In July 2025, Columbia adopted the IHRA definition of antisemitism.

23.     The Department of Education Office of Civil Rights has used the IHRA definition of antisemitism since at least December 2019, when Executive Order 13899 on combating antisemitism directed federal agencies to use the IHRA definition of antisemitism in their enforcement of Title VI.

24.     Anti-Zionism is opposition to Zionism, that is, opposition to the right for Jews to self-determine in their ancestral homeland of Israel. Expressions of anti-Zionism include vilification of people or groups associated with Zionism and the downplaying of the historic, religious, and spiritual Jewish connection to the land of Israel. Anti-Zionism is often thinly veiled antisemitism.

25.     Title VI protects Jewish students against discrimination in the terms or conditions of their education on account of their Jewish identity in any program or activity that receives federal funding.

## II.    Antisemitism at Columbia

26.    Columbia has long been a breeding ground for antisemitism. As one writer put it, "The story of American Jewry can be told, in part, by the history of Columbia's admissions policy."[1] In the early 1920s, as Columbia's student body became increasingly dominated by children of Jewish immigrants, Columbia began to use concepts such as geographic diversity and a well-rounded student body as pretexts to deny admission to Jews from New York City. In 1921, Columbia became one of the first private colleges to impose a quota limiting the number of Jews at the college. To educate (and profit from) the Jews it rejected, Columbia created Seth Low Junior College in Brooklyn. As the result of these policies, Jewish student enrollment at Columbia dropped from 40% to 25%.[2]

27.    Predictably, these policies created a campus environment increasingly hostile to Jews. In 1933, Hans Luther, the German Ambassador to the United States, delivered a speech to 1,200 Columbia students at the invitation of Columbia's president. Luther received a warm welcome, as he extolled the virtues of the new Nazi regime in Germany. His speech came just six months after Nazis orchestrated the first mass burning of books by Jewish authors and the removal of Jewish faculty from German universities.[3]

---

[1] Franklin Foer, *Columbia University's Anti-Semitism Problem* (March 17, 2025), https://www.theatlantic.com/ideas/archive/2025/03/columbia-antisemitism-israel-palestine-trump/682054/.

[2] Columbia Daily Spectator Staff, *Nearly a Century Ago, Columbia's Jewish Applicants Were Sent to Brooklyn* (Apr. 15, 2019), https://www.columbiaspectator.com/the-eye/2019/04/15/nearly-a-century-ago-columbias-jewish-applicants-were-sent-to-brooklyn/.

[3] *See generally* Ben Cohen, *Columbia University's Antisemitic Tradition is Alive and Well*, FOUND. FOR DEF. OF DEMOCRACIES (Apr. 26, 2024), https://www.fdd.org/analysis/op_eds/2024/04/26/columbia-universitys-antisemitic-tradition-is-alive-and-well/.

28.    There has been a deeply entrenched culture of hostility toward Jewish and Israeli students ever since. For decades, Columbia faculty have promoted antisemitic rhetoric and discriminatory ideologies under the guise of academic discourse. Professors such as Joseph Massad, Hamid Dabashi, Rashid Khalidi, and Mahmood Mamdani have used their platforms to delegitimize Jewish identity, deny Jewish historical claims to Israel, and justify violence against Jews.

29.    For example, Mamdani, Columbia's Herbert Lehman Professor of Government and father of New York City mayoral candidate Zohran Mamdani, has publicly equated Zionism with settler colonialism and claimed that Zionists in Israel "draw inspiration" from American genocide against Native peoples. He has also advocated for "the dismantling of the Jewish state," opining that "Jews can have a homeland in historic Palestine but not a state."

30.    This institutional tolerance for antisemitism has manifested in classrooms, student life, and campus events. Jewish students, for example, have been harassed, excluded from student groups, and subjected to slurs like "kike," "Zionist pig," and "baby killer." Faculty have intimidated students who express support for Israel. Diversity, Equity, and Inclusion programming has conspicuously excluded antisemitism from its curriculum and often depicts Zionist Jews as White supremacists, settler colonialists, and Nazis. Columbia's obsession with oppressor vs. oppressed narratives, race, and privilege often results in casting Jews as privileged oppressors. While Columbia routinely creates safe spaces for, educates against hate

toward, and promotes inclusion of other minority groups, Columbia routinely tolerates harassment, intimidation, and discrimination toward Jewish students.

31.    Columbia has selectively enforced its policies against discrimination and harassment, with Jewish students routinely denied accommodations and support that are readily extended to other minority groups. Columbia's refusal to act on credible complaints, including those documented in the 2004 film *Columbia Unbecoming* and subsequent federal investigations, has created a double standard that treats Jewish students as second-class citizens. This longstanding pattern of neglect and discrimination laid the foundation for the intensified antisemitism of the past two years.

32.    Following the October 7, 2023, massacre—which involved the mass murder, rape, and kidnapping of Israeli civilians—students and faculty, such as Joseph Massad who is still employed by Columbia, openly celebrated it, referring to it as "astounding" and "awesome." On October 8, 2023, Students for Justice in Palestine ("SJP") and Jewish Voice for Peace ("JVP") circulated a letter celebrating the October 7 massacre and organizing a "Call to Action for Palestine" rally on October 12. That rally, which was approved by Columbia to be held in the center of campus, included hundreds of students celebrating the massacre. The protesters chanted for an "end to the Zionist state" (Israel) an aspiration rooted in violence and antisemitism.

33.    As hundreds of students marched around campus euphorically chanting about the largest massacre of Jews in a single day since the Holocaust, many Jewish

students, including the Lederers, felt attacked, isolated, and alone. Columbia Hillel was forced to go on lockdown. At vigils on campus, Jewish mourners, including David, were shouted at and passersby yelled "Free Palestine." Faculty echoed these insults. Posters celebrating the attack became pervasive. Columbia's Campus Rabbi penned an op-ed, "Sounding the Alarm," in which he decried the fact that the Columbia community seemed to leave "no room for Jewish vulnerability" and declared he was "screaming from the rooftops: You have normalized [antisemitism]!"[4]

34.    Nevertheless, the Columbia administration remained silent for days following the October 7 attack. When President Shafik finally addressed the campus, she avoided naming the attackers and instead urged faculty to provide "context" for the attacks. This tepid response stood in stark contrast to Columbia's swift and forceful reactions to other events, such as George Floyd's murder, anti-Asian violence, and LGBTQ+ hate crimes, all of which prompted immediate statements of solidarity and promises of institutional reforms.

35.    Columbia's failure to act decisively after October 7 was compounded by its refusal to enforce its own antidiscrimination policies. Jewish students were physically assaulted, harassed, and blocked from campus spaces, yet Columbia did not discipline those responsible. Instead, Columbia negotiated with protest leaders, some of whom had publicly fantasized about murdering Zionists, and it allowed suspended groups like SJP and JVP to continue organizing antisemitic rallies and

---

[4] Yonah Hain, *Sounding the Alarm*, COLUMBIA SPECTATOR (Oct. 25, 2023), https://www.columbiaspectator.com/opinion/2023/10/24/sounding-the-alarm/.

protests. Meanwhile, Columbia denied Jewish students and student groups permission to hold peaceful events.

### III.  Columbia's Policies and Procedures on Antidiscrimination, Harassment, Intimidation, and Free Speech

36.    Columbia has at least ten applicable policies that ostensibly protect students from discrimination, harassment, and intimidation and give students the affirmative right to exercise Free Speech: (1) Equal Opportunity and Affirmative Action Policies and Procedures, Ex. A; (2) Rules of University Conduct, Ex. B; (3) Non-Discrimination Statement and Policy, Ex. C; (4) Standards and Discipline Policy, Ex. D; (5) University Event Policy, Ex. E; (6) Interim University Policy for Safe Demonstrations, Ex. F; (7) Guidelines to the Rules of University Conduct, Ex. G; (8) Student Group Event Policy and Procedure, Ex. H; and (9) Safety Escort Program, Ex. I. Each of these policies is attached as an exhibit to this Complaint.

37.    The Equal Opportunity and Affirmative Action Policies and Procedures prohibit discrimination and harassment based on, among other protected characteristics, creed, national origin, race, and religion. Columbia refers to these characteristics as a "protected class," or "protected classes." These policies and procedures prohibit "[t]reating members of a protected class less favorably because of their membership in that class."

38.    Harassment, in turn, is defined in part as "subjecting an individual to unwelcome conduct, whether verbal or physical, that creates an intimidating, hostile, or abusive working, learning, or campus environment; that alters the conditions

of . . . education; or unreasonably interferes with an individual's . . . academic performance on the basis of the individual's membership in a protected class."

39.     Harassment also includes "verbal abuse; epithets or slurs; negative stereotyping; threatening, intimidating, or hostile acts; denigrating jokes; insulting or obscene comments or gestures; and the display or circulation of written or graphic material (including in hard copy, by email or text, or through social media) that denigrates or shows hostility or aversion toward an individual or group members of a protected class."

40.     Columbia's "Rules of University Conduct" state that "the University has an obligation to assure members of its community that they can continue in their academic pursuits without fear for their personal security or other serious intrusions on their ability to teach and to study."

41.     The Rules of University Conduct affirmatively commit the school to protecting freedom of speech and expression, stating the Rules "are intended to ensure that all members of our community may engage in our cherished traditions of free expression and open debate."

42.     Consistent with that offer and promise to "all members of our [Columbia] community," Columbia "cannot and will not rule any subject or form of expression out of order on the ground that it is objectionable, offensive, immoral, or untrue." The only two exceptions are time, place, and manner restrictions, as well as "expression that constitutes a genuine threat of harassment." This is true even at

"any demonstration, including a rally or picketing, that takes place on or at a University facility or at any University sponsored activity."

43.    Columbia's "Non-Discrimination Statement and Policy" prohibits discrimination against any person on the basis of citizenship status, creed, national origin, race, religion, or "any other applicable, legally protected status."

44.    The "Standards and Discipline Policy" prohibits misconduct that is considered disruptive, harassing, constitutes vandalism or causes damage to property, or otherwise violates Columbia's policies or the law. Specifically, students that interfere with "the ability of others to take advantage of the full complement of University life" are subject to discipline.

45.    This same policy recognizes that "calls, texts, emails, and social media usage by students can contribute to a hostile work, learning, or living environment, even if they occur away from the University premises."

46.    The "University Events Policy" governs events both on and off campus. It provides that "the University may regulate the time, place and manner of certain forms of public expression. This includes restricting certain activities when the University believes there is a genuine threat of harassment and/or potential for an unmanageable safety concern."

47.    In February 2024, Columbia issued an interim policy purportedly to improve the safety of demonstrations. The "Interim University Policy for Safe Demonstrations" provided for designated demonstration areas and times. It further required two-day notice for event registration. It also prohibited advertising

demonstrations without prior approval and sets forth procedures for redressing violations by individuals and student groups.

48.    In August 2024, the Columbia University Senate relaxed those demonstration guidelines. In its "Guidelines to the Rules of University Conduct," Columbia did away with designated demonstration areas and times and the two-day notice requirement. Rather, the new Guidelines merely require that "[o]rganizers or sponsors of demonstrations, protests, and other similar events *should* provide notice no later than at the time of their public announcement . . . so that any preparations deemed necessary for ensuring the safety of the community *may* be made by the relevant campus office(s)." (Emphasis added).

49.    The "Student Group Event Policy and Procedure" governs the process for *recognized* student groups to host events. This policy is "intended to promote safe and responsible social events for Columbia University's recognized student organizations, and its requirements include that the "conduct of all guests is bound by University Rules." Under this policy, "the student group may be held responsible for the behavior of their invited guests."

50.    Columbia's Department of Public Safety has a "Safety Escort Program," which "provides a walking escort *any time* when requested, seven days a week." The escort must be "within the geography from West 108th Street to West 110th Street between Amsterdam Ave. and Riverside Drive and from West 110th Street to West 122nd Street between Morningside Drive and Riverside Drive."

51.    Columbia also has official rights and procedures for student discrimination and discriminatory harassment. This includes rights like "a prompt and thorough review."

52.    Specifically, to the issues here, the procedures require that when a student reports discriminatory harassment, the Office of Institutional Equity must initiate a formal investigative process unless both parties agree to an administrative resolution.

53.    The procedures also list a handful of interim measures to protect the safety of all involved and preserve the integrity of the investigative process. One of those measures is a No Contact Directive. The No Contact Directive, however, is not intended to serve as a substitute for disciplinary action unless both parties agree that it so serves.

54.    Furthermore, Columbia's procedures require that all reports of discriminatory harassment be evaluated promptly and impartially, with appropriate sanctions imposed when violations are substantiated.

55.    These procedures also mandate that all reports and investigations be handled in a manner that is neutral, consistent, and free from bias. The procedures emphasize the importance of equitable treatment for all parties, regardless of identity or affiliation, and require that disciplinary actions be applied uniformly.

56.    The nondiscrimination and harassment procedures also require that all students be afforded equal access to institutional support and protection when reporting discriminatory harassment. Columbia promises to provide a safe and

supportive environment for complainants, including access to impartial administrators and appropriate remedies.

57.     The procedures also require that disciplinary actions be proportionate, transparent, and based on clearly communicated standards.

## IV.     Antisemitic Harassment, Discrimination, and Intimidation Against Plaintiffs

58.     Despite Columbia's promise of a safe learning environment free from harassment, discrimination, or intimidation, David and Jonathan were repeatedly assaulted, harassed, discriminated against, and intimidated on the basis of their Jewish identity.

### A. Columbia punishes David for social media posts about a non-Jewish student but refuses to discipline the non-Jewish student for similar posts about David.

59.     On January 17, 2024, David reported student activist Layla Saliba for antisemitic harassment of David online. Ms. Saliba was a leader and organizer of many of the antisemitic events on campus. Throughout December 2023, Ms. Saliba repeatedly doxxed and targeted David and Jonathan on social media. She also targeted David for speaking at a fundraiser for emergency first responders in Israel. Ms. Saliba has publicly posted a picture of her lawyer, Stanley Cohen, who has "stood with Hamas as a lawyer," and posed with deceased Hamas leader Ismail Haniyeh.

60.     David made the report about Ms. Saliba to the newly formed Doxxing Resource Group. The Doxxing Resource Group submitted a report to the Student Conduct team on David's behalf, as they are required to do, but did not take any further action. David was directed to former Associate Dean for Student and Family

Support, Matthew Patashnick and former Dean of Undergraduate Student Life, Cristen Kromm. While former Dean Patashnick provided David with generic resources about doxxing, neither he nor former Dean Kromm took any further action on David's report.

61.     It is not surprising that former Deans Patashnick and Kromm declined to act. They later resigned in disgrace after their participation in an antisemitic group text chain with other Columbia administrators was revealed. The texts included numerous antisemitic tropes about Jewish privilege, money, and power. For example, referring to the Hillel President's discussion of Jewish students' experiences of antisemitism on campus, former Dean Patashnick wrote, "He knows exactly what he's doing and how to take full advantage of this moment. Huge fundraising potential." Kromm liked the message and responded, "you named it." Patashnick went on to say that "soon they'll have their own dorm," referring to Jewish students. Kromm later texted "amazing what $$$$ can do" and used a vomiting emoji in reference to Jewish students' experiences of antisemitism. These are the administrators to whom Columbia referred David when he submitted a complaint that he had been doxxed due to his Jewish identity.

62.     Months later, on March 21, 2024, Columbia issued a mutual no contact directive to both David and Ms. Saliba. While the directive cited "an incident that occurred on January 9, 2023," to this day, David is unaware of any incident between himself and Ms. Saliba on that date. Given the significant delay between David's report and the no contact directive, David is unaware of whether the no contact

directive was a delayed response to his complaint or a response to a complaint filed by Ms. Saliba. Either way, Columbia's response demonstrates a total lack of concern for David's wellbeing or clear preferential treatment for a non-Jewish student—most likely, both.

63.     On April 7, 2024, David posted on X (formerly Twitter) to debunk some of Ms. Saliba's statements about a rally Jewish students held. She had claimed Jewish protesters played sirens to silence anti-Israel advocates. David posted a video clearly showing it was in fact anti-Israel protesters who approached the Jewish group with sirens to silence their chants calling for the release of Kfir Bibas, the youngest hostage. Because his post did not mention Ms. Saliba by name and was not directed toward her, David believed the post to be permitted by the no contact directive. In response, Ms. Saliba, in direct violation of the no contact directive's confidentiality provisions, posted a picture of the directive, claiming David was harassing her.

64.     In direct contrast to Columbia's handling of David's complaint that Ms. Saliba harassed him, Columbia immediately leapt to action, issuing David a notice that he violated the no contact directive and summoning him to a meeting with the Student Conduct team on June 17, 2024. During that meeting, the Student Conduct team assured David that social media posts do not violate Columbia's policies or Columbia's no contact directives so long as there is no direct contact with the individual. David assumed this was why his reports of Ms. Saliba did not result in any discipline of her, at least to his knowledge. On July 11, 2024, the Student Conduct team informed David that it was not pursuing charges and that the case was closed.

65.    In August 2024, after the Israeli military killed Ismail Haniyeh, Hamas's long-time political leader, Ms. Saliba posted a picture of her lawyer, Stanley Cohen, posing with Haniyeh. Many members of the Columbia community felt the post was outrageous and publicly criticized it. David was one of them. On August 5, 2024, David posted a screenshot of Ms. Saliba's post to inform his followers of what was occurring on Columbia's campus. His post did not include Ms. Saliba's name and did not tag her or link to her account in any way.

66.    David was shocked when he received another letter on August 19, 2024, notifying him that he may have violated the no contact directive. In a meeting with the Student Conduct team on August 27, 2024, he explained that he believed his post was consistent with the Student Contact team's previous conclusion that social media posts would not violate the no contact directive if there was no direct contact.

67.    Nevertheless, on September 10, 2024, Columbia placed David on conditional disciplinary probation for violating the no contact directive. The decision noted that because David's post could conceivably cause "third party members to communicate with" Ms. Saliba, it violated the no contact order. Columbia rejected David's appeals of the conditional probation decision.

68.    In the following months, Ms. Saliba posted about David multiple times to her more than thirty thousand followers, again violating the no contact directive. These posts contained his name and face and led to harassment against him. These included two posts on September 27, 2024, and another post on March 15, 2025. David reported both of them. Based on the number of Ms. Saliba's no contact order

violations, she should have been suspended under the Student Conduct procedures. While Columbia does not share student disciplinary actions, because Ms. Saliba graduated at the end of the academic year and continued to post about David after his reports, Plaintiffs do not believe Columbia ever sanctioned Ms. Saliba in response to David's reports. Thus, the same actions for which Columbia silenced and sanctioned David went unsanctioned against Ms. Saliba, permitting her conduct to continue unabated.

69.    Despite the improper application of Columbia's procedures to David, he remained on probation for the rest of the year. Such biased treatment has affected his academic future, put his graduation and other future plans at risk, and chilled his speech.

70.    David's experience is not abnormal. The Student Conduct team routinely imposes excessive sanctions on Jewish or Zionist students while imposing minimal to no sanctions on non-Jewish or anti-Zionist students. For example, when another student activist, Khymani James, infamously stated in a disciplinary hearing in January 2024, which he livestreamed to social media, that "Zionists don't deserve to live," Columbia did not publicly punish James until April 2024, seemingly only after a video of him excluding Jewish students from the campus lawn went viral.

71.    Again, Plaintiffs hear the message loud and clear from Columbia: Jews are not the same, are not treated the same, and nobody at Columbia wants to hear from them.

**B. The "Gaza Solidarity Encampment" wreaks havoc on campus, and Columbia faculty and students block Jewish students like David and Jonathan from accessing parts of campus.**

72.    Late during the night of April 16, 2024, and leading into the morning of April 17, Columbia students affiliated with Columbia University Apartheid Divest ("CUAD"), SJP, and JVP launched a "Gaza Solidarity Encampment" on the South Lawn in front of Butler Library (the "Encampment"). Approximately sixty tents were erected. This Encampment quickly became a hub for antisemitic slogans, chants, and iconography. Protesters and Encampment members displayed banners glorifying violence against Jews, including references to the October 7 attack, and chanted "from the River to the Sea Palestine will be free," "intifada revolution," and "we don't want no Zionists here." Social media posts associated with the Encampment depicted paragliders landing on campus—a direct reference to the terrorists who used paragliders during the October 7 massacre.

73.    The Encampment disrupted campus life for nearly two weeks, creating a hostile and dangerous environment for Jewish students. Jewish students were physically blocked from entering campus spaces, harassed, and subjected to slurs and threats. Faculty members actively participated, some guarding the Encampment and others delivering speeches in support of the protesters. Despite widespread reports of intimidation and antisemitic conduct, Columbia's administration chose to negotiate with protest leaders rather than enforce its own policies. Although President Shafik eventually authorized the New York Police Department to clear the Encampment on April 18, 2024, it was quickly reassembled nearby, and the harassment continued without any response from Columbia.

74.    The Encampment marked a turning point in Columbia's campus climate, with Jewish students reporting widespread fear, exclusion, and academic disruption. Rabbi Elie Buechler of Columbia Hillel advised Jewish students to leave campus for their safety, citing the University's inability to protect them.

75.    Nearly two weeks into the Encampment, on April 30, protesters escalated their actions by occupying Hamilton Hall.. This prompted Columbia to issue a shelter-in-place order, directing students to remain in their dorms and stay away from campus. Throughout this period, Columbia extended deadlines and offered concessions to protest leaders, while it denied Jewish students basic protections or accommodations. The Encampment, and the University's lack of response to it, is emblematic of Columbia's broader failure to address antisemitism on campus.

76.    During the Encampment, both students *and faculty* blocked Jewish students from parts of campus for no other reason than their membership in a protected class. Jewish students who were suspected of "Zionism" were told they did not follow the Encampment's "community guidelines." The students and faculty guarding entrances to the Encampment wore official vests.

77.    Some faculty members who blocked Jewish students from entering the Encampment (thereby excluding them from parts of campus), were members of the University Senate and included Joseph Slaughter, Susan Bernofsky, Joseph Howley, and Mahmood Mamdani.

78.    The import of this cannot be overstated. At the direction of Columbia faculty members, specific portions of campus became inaccessible to Jewish students

who adhered to a specific tenet of their religion. This is the equivalent of refusing to serve Kosher meals in the campus cafeteria or requiring a Jewish student to attend class on the Sabbath.

**C. Jonathan is assaulted during the Encampment.**

79.     In mid-April 2024, at the height of the Encampment, Columbia purportedly closed campus to individuals not affiliated with Columbia ("non-affiliates") due to concerns that non-affiliates pose a security risk. However, Columbia refused to enforce this policy. Jewish students repeatedly requested public safety to remove non-affiliates from campus, often members of the anti-Israel activist organization Within Our Lifetime, but Columbia refused to do so.

80.     While the Encampment was active, many Jewish students felt too frightened to even walk on campus. Jonathan and David wanted to encourage their Jewish peers and sought to demonstrate that it was okay to be proudly Jewish at Columbia.

81.     On April 20, they organized a group of friends to meet on campus to sing Jewish songs and hold Israeli flags. As Jonathan and David were waiting for their friends to arrive, masked protesters surrounded them. One grabbed a large Israeli flag from the Lederers and ran. Jonathan followed him, demanding it back. The instigator ran with it to fellow protesters. Jonathan was surrounded and pushed by a mob of fully masked individuals. As others were yelling obscenities at him, calling him a genocidal maniac, one protester, James Carlson, a forty-year-old non-affiliate, lit the flag on fire.

82.     As Jonathan grabbed the flag the mob began pelting him with objects, hitting multiple times. He was pinned, surrounded on all sides, with the Columbia gate behind his back. One object struck him directly in the face. The man who threw it, Zuhdi Ahmed, a non-affiliate, then gave him the middle finger. With the flag in hand, Jonathan frantically ran from the mob.

83.     Jonathan never felt so unsafe and vulnerable in his life. David had never seen Jonathan so shaken up before.

84.     Despite Columbia's supposed policy prohibiting non-affiliates on campus, non-affiliate protesters overran Columbia's campus during the Encampment. Columbia did not permit NYPD on campus and there were very few campus safety officers present.

85.     On the same night, April 20, after the Lederers' friends arrived, the Lederers moved to a more open area, away from the protesters. As they were singing songs, masked protesters approached within inches of them, intentionally trying to intimidate the Jewish students. Other individuals threw water at Jonathan and David, taunting and harassing them. Another masked protestor held a sign with an arrow pointing towards the Lederers and their peers that said "Al-Qasam's Next Targets," referencing the Al-Qassam Brigades, Hamas's military wing. James Carlson, the same person who lit Jonathan's flag on fire earlier in the night, again attempted to steal one of the Jewish students' flags. At one point, a campus safety officer walked past the Jewish group, witnessed what was happening, glanced at his phone, and then left.

86.     That night, David and Jonathan saw Nerdeen Kiswani, a non-affiliate and leader of Within Our Lifetime, walking around campus and speaking to a large crowd at the Encampment. The Lederers were familiar with Kiswani and Within Our Lifetime because in 2021, Joseph Borgen, a member of the Lederers' hometown synagogue, was brutally beaten, stomped on, and pepper sprayed by a gang of masked protesters who passed him as they were leaving a Within Our Lifetime rally near Times Square. He was wearing a yarmulka at the time and was visibly Jewish. The attack left Borgan hospitalized with severe injuries. This incident left an indelible mark on Jonathan and David. The presence of Within Our Lifetime on campus and Columbia's refusal to remove them made it clear that Columbia's campus was not safe for David, Jonathan, or their fellow Jewish students.

87.     As the protesters became more unruly, David, Jonathan, and their friends began to pack up to leave. The Chabad Rabbi came to check on the Jewish students, walking with the students as they headed home. The protesters again surrounded the Lederers, their friends, and the Rabbi, cursing at them, calling them inbred, and exclaiming that they (the Jewish students) have no culture. They followed the Lederers' group all the way to the campus gates. Despite the increasingly dangerous environment for Jewish students, there were very few campus safety officers present, and no NYPD officers. When the group did manage to find a campus safety officer, who was stationed at the gate, a member of the group requested an escort home (pursuant to Columbia's Safety Escort Program). The campus safety officer refused.

88.     As David and Jonathan's group walked outside the campus gates, they were again met by a mob of protesters. The mob screamed antisemitic tropes and obscenities at them, such as "go back to Poland," "F*ck you," and "get out of here." The group was terrified. Some of David and Jonathan's friends were able to find NYPD officers outside of the campus gates to escort them a couple blocks, while others had to walk home alone.

89.     Campus that night felt like anarchy. Jonathan, David, and their fellow Jewish students all felt abandoned by Columbia.

90.     The Encampment prompted Columbia's Hillel Rabbi to issue a statement to the Jewish Community that Columbia's campus was no longer safe for Jewish students and that Jewish students should leave campus.

91.     After their experience on April 20, David and Jonathan agreed. The next day, their father picked them up, and they left Columbia's campus. They no longer felt safe there.

**D. Columbia stifles David's and Jonathan's ability to counterprotest anti-Israel protests on campus.**

92.     On September 27, 2024, David and Jonathan organized a counterprotest to CUAD's planned event at the Sundial, a location in the center of campus. David and Jonathan followed Columbia's Guidelines to the Rules of University Conduct, which had replaced the former time, place, and manner regulations that required students to book locations prior to hosting events. The new Guidelines, issued *after* the Encampment persisted on campus for days, effectively removed the University's ability to regulate demonstrations on campus altogether. The Guidelines stated that

protesters *should* notify Columbia before a demonstration and that Columbia *could* recommend a location for the protest. David and Jonathan notified the University. Columbia *suggested* that they host their event at Furnald Lawn, a remote location tucked in the southwest corner of campus, completely out of sight, which would defeat the purpose of the event—to peacefully and visibly counterprotest CUAD's event at the Sundial.

93.    Because Columbia's recommendation to hold the event at Furnald Lawn was, under the Guidelines, just that—a recommendation, David and Jonathan planned to counterprotest at the Sundial. When they arrived, a campus safety officer instructed David not to use the speaker he brought with him, even though CUAD was permitted to use unauthorized amplified sound throughout its protest.

94.    Later, as CUAD members repeatedly approached David and Jonathan's group threatening escalation, campus safety officers and "University Delegates" (appointed to manage these protests), as directed by University administrators, instructed David and Jonathan's group—not the CUAD members—to move back. Campus safety officers then attempted to implement a "buffer zone" between the two protests, but the officers repeatedly permitted CUAD members to occupy the buffer zone while pushing David and Jonathan's group further and further away from the Sundial. The Chair of the University Senate, Dr. Jeanine D'Armiento, then told a member of David and Jonathan's group that they should move to Furnald Lawn to "respond to the safety concerns of the university." Contrary to the Guidelines, she said that if the University Senate assigns a new location to an event, the student

group must comply. Columbia never told CUAD or its members to move locations or respond to safety concerns.

95.    It is no surprise that Dr. D'Armiento sought to silence Jewish students' speech. She spearheaded the relaxation of time, place, and manner restrictions in the University Senate to ensure more freedom for antisemitic protesters. In doing so, she repeatedly diminished safety concerns raised by Jewish students and faculty. In fact, when a Jewish faculty member expressed concern that non-affiliates with ties to terrorist organizations were infiltrating student protests (which has been well-documented), Dr. D'Armiento muted the faculty member's microphone and stated, "I cannot allow that kind of thing in a time like this." When Jewish students began engaging in free expression under her relaxed Guidelines, Dr. D'Armiento flipped, suddenly emphasizing safety concerns stemming from the Jewish students' speech.

## E. Columbia allows an antisemitic mob to terrorize David, Jonathan, and other Jewish students on the anniversary of October 7.

96.    On October 7, 2024, the one-year anniversary of the October 7 attack, Jewish students organized an art installation on one of the campus lawns to memorialize the lives lost and remember the hostages still in captivity. David attended the art installation, and Jonathan participated in a rally nearby to likewise commemorate the one-year anniversary. Meanwhile, SJP and CUAD organized an "Al Aqsa Flood Walkout" to "commemorate the historic Al-Aqsa Flood operation" (Hamas's name for October 7). Protesters held signs that depicted Hamas and Hamas iconography and read "Victory to the resistance."

97.     Suddenly, the protesters left their designated area and marched around campus, some chanting, "Resistance is glorious. We will be victorious." The mob surrounded Jonathan and other Jewish students, and public safety officers barricaded the Jewish students into their designated area, preventing them from leaving. The protesters continued marching, blocking campus pathways and disrupting campus activities with their amplified sound. They stopped for several minutes by the Jewish students' art installation, targeting the Jewish students there, including David.

98.     To the Lederers' knowledge, no one was disciplined that day for terrorizing Jewish students on the anniversary of the deadliest day for the Jewish people since the Holocaust. The incident had a significant mental and emotional toll on David and Jonathan, who felt they were not welcome or able to express their Jewish identity on Columbia's campus.

**F. Jonathan is assaulted a second time.**

99.     On December 9, 2024, at a rally in which Columbia SJP invited Within Our Lifetime to the streets outside Columbia, Tarek Bazrouk, an affiliate of Within Our Lifetime, punched Jonathan in the face while David and Jonathan were standing on 116th Street and Broadway and speaking to a journalist. He also ripped an Israeli flag out of David's hand and called Jonathan and David "Nazis."

100.     Bazrouk was arrested and charged with a hate crime for the assault. The Federal Bureau of Investigation ("FBI") discovered antisemitic text messages on Bazrouk's phone (identifying himself as a "Jew hater" and labeling Jews "worthless")

and weapons in his apartment. The FBI also discovered that Bazrouk was a member of a group chat that received regular updates from the official spokesperson of Hamas's military wing. Bazrouk wore Hamas headbands at protests.

101.    Despite the assault on Jonathan and clear evidence that individuals like Bazrouk are associated with Hamas, Columbia has repeatedly let members of Within Our Lifetime on campus and has refused requests to remove them. Their presence on campus places all Jewish students at risk.

## G. Columbia refuses to discipline a student David reports for harassment.

102.    On February 17, 2025, Andrew Timberg, who was then a Columbia student and an affiliate of CUAD, held his two middle fingers up towards David in a threatening manner. David recognized Timberg, as Timberg had previously harassed Jonathan after Jonathan was punched by Bazrouk as discussed above. Timberg approached Jonathan afterwards, yelling, "I saw that shit, it was hilarious."

103.    David reported the February 17, 2025, incident with Timberg to Columbia's Office of Institutional Equity. In a meeting on March 25, 2025, an Office of Institutional Equity representative asked David whether he wanted a no contact directive or disciplinary action to be taken. David responded that he wanted Columbia to take disciplinary action after an official investigative process. Nevertheless, Columbia notified David on April 8, 2025, that it had issued a no contact directive to Timberg as a "Final Resolution" between David and Timberg.

104.    Plaintiffs do not believe Columbia ever disciplined Timberg or initiated an official disciplinary investigation into Timberg's harassment of David or Jonathan.

**H. Jonathan and David face repeated acts of harassment, discrimination, and intimidation throughout the 2023, 2024, and 2025 academic years.**

105.   In addition to the incidents above, David and Jonathan faced repeated acts of harassment, discrimination, and intimidation throughout the 2023, 2024, and 2025 academic years. Below are just a few of the more egregious incidents.

106.   On November 9, 2023, as David distributed flyers on the Columbia campus with the Hamas Charter and the Israeli Declaration of Independence, a student and affiliate of Within Our Lifetime, Fadi Shuman, verbally harassed and intimidated David. David reported Shuman to Columbia, but Columbia did not even issue a warning to Shuman, according to a report published by the House Committee on Education and Workforce. Shuman, a repeat offender, was eventually arrested in the Butler Library Takeover on May 7, 2025, after he and around 100 other protesters stormed the library, disrupting students studying for final exams.

107.   In another instance, while the Encampment was active in April 2024, members of the Encampment screamed at David while he was walking nearby, "Zionists get no bitches."

108.   On February 26, 2025, Jonathan was unable to attend an accounting class in which he was enrolled because student protesters took over Barnard's Milbank building. The protesters stayed in the building for hours, disrupting academic activities, while Columbia negotiated with them instead of removing them. The public safety officer who prevented Jonathan from entering the building, Bahir Mustafa, has repeatedly posted antisemitic comments on social media such as, "Zionists Jews owns the USA" and "Zionists are pure evil." This is who Columbia put

in charge of managing the takeover of the Barnard Milbank building and ensuring Jewish students' safety.

109.    On May 7, 2025, David was blocked from entering Butler Library by student protesters who formed a chain and physically prevented him from entering the building. David was trying to enter the library to study for his final exams. One of the protesters, wearing a mask, yelled, "Don't let him in! He's a fucking Zionist!" in reference to David.

110.    Columbia's failure to ensure the safety and well-being of Jewish students like David and Jonathan caused both David and Jonathan severe mental and emotional anguish. It also interfered with their ability to enjoy the full benefits of their education. David's grades significantly dropped in the Fall of 2023, and Jonathan's GPA likewise declined after October 7 and the Spring 2024 Encampment. These lower grades will likely impact David and Jonathan's employment prospects after graduation.

## COUNT I
### TITLE VI – DISCRIMINATION: HOSTILE ENVIRONMENT
### (42 U.S.C. §§ 2000d *et seq.*)
### On Behalf of Both Plaintiffs

111.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

112.    Plaintiffs are Jewish students enrolled at Columbia University and are, therefore, members of a protected class. Discrimination against Jews is prohibited under Title VI.

113.   Columbia receives financial assistance from the United States Department of Education and is, therefore, subject to suit under Title VI.

114.   The acts and omissions of Columbia and its administrators have subjected Plaintiffs to discrimination and harassment based on their Jewish identity. This created a hostile environment that was severe, pervasive, and objectively offensive. For example, as discussed in detail above, Jonathan was twice assaulted, Jonathan and David were both blocked from entering Columbia buildings, and both Jonathan and David have been repeatedly harassed by mobs of antisemitic protesters while on Columbia's campus.

115.   Columbia and its administrators had actual notice that such discrimination and harassment, over which Columbia had substantial control and authority to remedy, was so severe, pervasive, and objectively offensive that it created a hostile environment based on Plaintiffs' Jewish identity.

116.   Columbia's hostile environment deprived Plaintiffs of full access to Columbia's educational programs, activities, and opportunities. For example, Students and faculty members blocked Jews like David and Jonathan from areas of campus, and both Jonathan and David were prohibited from entering campus buildings because of their Jewish identity.

117.   Columbia maintains substantial control over the Columbia campus and over the conduct of those present on its campus, including students and faculty, through Columbia's various policies and through Columbia's ability to discipline those who harass Jewish students or create a hostile environment for Jews on

campus. For example, Columbia's Equal Opportunity and Affirmative Action Policies and Procedures require that investigations into discrimination be conducted impartially and that disciplinary actions be applied consistently and without bias. Similarly, Columbia's own procedures require that the Office of Institutional Equity initiate a formal investigation when a student reports harassment. Also, the Interim University Policy for Safe Demonstrations and Student Group Event Policy and Procedures put the responsibility for invited guests on the student groups and require them to submit to the University Rules of Conduct.

118.   Columbia and its administrators also intentionally discriminated against Plaintiffs based on their Jewish identity, as exhibited by Columbia's and its administrators' deliberate indifference to the repeated antisemitic abuse, harassment, and intimidation of Plaintiffs. Columbia and its administrators clearly and unreasonably failed to cure or otherwise adequately, appropriately, and meaningfully address the discrimination and hostile environment Plaintiffs suffered because of their Jewish identity. Columbia failed to take prompt and effective steps reasonably calculated to end the harassment, eliminate the hostile environment, and prevent the harassment from recurring. Columbia's deliberate indifference caused Plaintiffs to be subjected to a hostile educational environment.

119.   As a direct and proximate result of Columbia's acts and omissions, Plaintiffs have suffered and continue to suffer injury and damages in amounts to be determined at trial.

<u>COUNT II</u>
**TITLE VI – DISCRIMINATION: DISPARATE TREATMENT**
**(42 U.S.C. §§ 2000d *et seq.*)**
**On Behalf of Both Plaintiffs**

120.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

121.    Plaintiffs are Jewish students enrolled at Columbia University and are, therefore, members of a protected class. Discrimination against Jews is prohibited under Title VI.

122.    Columbia receives financial assistance from the United States Department of Education and is, therefore, subject to suit under Title VI.

123.    The acts and omissions of Columbia and its administrators have subjected Plaintiffs disparate treatment based on their Jewish identity. These acts, omissions, and conduct were intended to treat Plaintiffs different as Jewish students compared to other similarly situated non-Jewish students.

124.    Columbia subjected Plaintiffs to adverse action. For example, Columbia disciplined David for social media posts about a non-Jewish student but refused to discipline the non-Jewish student for similar posts about David. Columbia subjected events and protests planned by David, Jonathan, and their fellow Jewish students to more stringent restrictions than events and protests planned by non-Jewish students and student organizations. And Columbia excluded David, Jonathan, and other Jewish students from academic buildings while permitting non-Jewish students to march, protest, and disrupt activities in those same buildings.

125.    Plaintiffs are the intended beneficiaries of the federal funding to Columbia, and Plaintiffs are entitled to participate in the federally funded program from which they were excluded.

126.    Columbia's entire course of conduct over the span of nearly two years demonstrates that Columbia has directly and intentionally discriminated against Plaintiffs and that Plaintiffs' Jewish ethnicity was a substantial or motivating factor in Columbia's actions and omissions.

127.    Plaintiffs were treated less favorably than similarly situated individuals who are not members of the protected class. For example, Columbia disciplined David for social media posts about a non-Jewish student but refused to discipline the non-Jewish student for similar posts about David. Columbia subjected events and protests planned by David, Jonathan, and their fellow Jewish students to more stringent restrictions than events and protests planned by non-Jewish students and student organizations. And Columbia excluded David, Jonathan, and other Jewish students from academic buildings while permitting non-Jewish students to march, protest, and disrupt activities in those same buildings.

128.    As a direct and proximate result of Columbia's acts and omissions, Plaintiffs have suffered and continue to suffer injury and damages in amounts to be determined at trial.

<u>COUNT III</u>
**NEW YORK CITY HUMAN RIGHTS LAW – DISCRIMINATION**
**(N.Y.C. Admin. Code §§ 8-107, 8-502)**
**On Behalf of Both Plaintiffs**

129.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

130.    The New York City Human Rights Law prohibits Columbia from subjecting Jewish students to discrimination or harassment based on their actual or perceived race, creed, or national origin. N.Y.C. Admin. Code § 8-107(4), (17).

131.    Plaintiffs are and openly identify as Jewish. Plaintiffs' Jewish identity is protected by New York City Administrative Code § 8-107.

132.    The acts and omissions of Columbia subjected Plaintiffs to discrimination and harassment in their civil rights and the exercise thereof on the basis of their Jewish identity.

133.    For example, as discussed above, Columbia's acts and omissions created a hostile environment that deprived Plaintiffs of the equal opportunity to access Columbia facilities and enjoy the benefits of their Columbia education and treated Plaintiffs different based on their Jewish identity.

134.    Columbia and its administrators intentionally engaged in this pattern of severe and pervasive discrimination.

135.    Columbia's acts, omissions, and conduct had an unjustifiable, differential or disparate impact upon Plaintiffs as Jewish students in violation of N.Y.C. Admin. Code § 8-107(7).

136.    As the actual, direct, and proximate result of Columbia's acts, omissions, and conduct, Plaintiffs suffered substantial injuries and damages, including loss of the value of their education, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, in amounts to be determined at trial.

137.    Columbia's acts, omissions, and conduct amount to willful or wanton negligence, recklessness, and/or a conscious disregard of the rights of others.

138.    Plaintiffs have complied with the procedural requirements of the New York City Human Rights Law by serving notice of this Complaint on the City Commission on Human Rights and the Corporation Counsel at or before the commencement of this action.

<u>COUNT IV</u>
**BREACH OF CONTRACT**
**(New York Law)**
**On Behalf of Both Plaintiffs**

139.    Plaintiffs repeat and reallege the allegations of the preceding paragraphs as though fully set forth herein.

140.    At all relevant times, a contractual relationship existed between Columbia and Plaintiffs by virtue of Plaintiffs' enrollment at Columbia and defined through Columbia's policies and procedures, including: (1) EOAA Policies and Procedures, Ex. A; (2) Rules of University Conduct, Ex. B; (3) Standards and Discipline Policy, Ex. C; (4) Non-Discrimination Statement and Policy, Ex. D; (5) University Event Policy, Ex. E; (6) Interim University Policy for Safe Demonstrations, Ex. F; (7) Guidelines to the Rules of University Conduct, Ex. G; (8)

Student Group Event Policy and Procedure, Ex. H; and (9) Safety Escort Program, Ex. I. Through these and other documents, Columbia makes contractual offers to its students, which the students accept by enrolling at Columbia and paying tuition to Columbia in exchange for the promises in these policies, among other things. Upon information and belief, each of these policies were in place at the relevant times and the quoted language from these policies is believed to be the language in effect at the time.

141.    New York courts have consistently held that when a student enrolls at an institution of higher learning, like Columbia, an implied contract is formed. The contract is based on the university's representations in materials such as catalogs, handbooks, and codes of conduct.

142.    Plaintiffs fully complied with and performed their contractual obligations.

143.    Columbia breached its agreements and obligations to Plaintiffs including by, among other things, failing to comply with the following promised provisions:

a.    "Columbia University is committed to providing a learning, living, and working environment free from prohibited discrimination and harassment and to fostering a nurturing and vibrant community founded upon the fundamental dignity and worth of all its members." Ex. A at 3.

b.    "Harassment may include, but is not limited to: verbal abuse; epithets or slurs; negative stereotyping; threatening, intimidating or hostile acts; denigrating

jokes; insulting or obscene comments or gestures; and the display or circulation of written or graphic material (including in hard copy, by email or text, or through social media) that denigrates or shows hostility or aversion toward an individual or group members of a protected class." Ex. A at 7.

c.       "All employees . . . have an obligation to immediately report harassment [and] discrimination." Ex. A at 16.

d.       "The Rules of University Conduct . . . are intended to ensure that all members of our community may engage in our cherished traditions of free expression and open debate." Ex. B at 1.

e.       "[T]he University reasonably regulates the time, place, and manner of certain forms of public expression. . . . [T]hese regulations do not turn on the content of any message that might be expressed." Ex. B. at 1–2.

f.       "[T]he University may restrict expression that constitutes a genuine threat of harassment, that unjustifiably invades and individuals privacy, or that falsely defames a specific individual." Ex. B at 2.

g.       "The University has an obligation to assure members of its community that they can continue in their academic pursuits without fear for their personal security or other serious intrusions on their ability to teach and to study. All demonstration activity is subject to the University's anti-discrimination and anti-harassment policies." Ex. B at 2.

h.       Violations of the Rules of University Conduct include threatening to or placing another in danger of bodily harm or causing or attempting to cause physical

harm; incitement; property damage; interfering with an entrance or exit or physically preventing passage from a University facility; causing "a noise that substantially hinders others in their normal academic activities;" and interrupting a University function. Ex. B at 4–5.

i.      "Students are expected to conduct themselves in an honest, civil, and respectful manner in all aspects of their lives. Students who violate standards of behavior related to academic or behavioral conduct interfere with their ability, and the ability of others, to take advantage of the full complement of University life, and will thus be subject to Dean's Discipline." Ex. C. at 2.

j.      "The University prohibits any form of discrimination against any person on the basis of . . . citizenship status; . . . creed; . . . national origin; . . . race; religion; . . . or any other applicable, legally protected status in the administration of its educational policies, admissions policies, employment, scholarship and loan programs, and athletic and other University-administered programs and functions." Ex. D.

k.      "The University has an obligation to ensure that all members of our community can participate in their academic pursuits without fear for their safety." Ex. E at 3.

l.      "Attendees at events held without approval . . . will be required to disperse. University groups or individual members of the community who proceed with Special Events, Vigils or Demonstrations that have not been approved as

described . . . will be subject to discipline and sanctions consistent with applicable University policy." Ex. E at 4.

m.    The Interim University Policy for Safe Demonstrations required demonstrations to only take place in designated spaces and at designated times in a manner that does not disrupt University matters: "In order to ensure safety and limit potential interference with normal University activities, Demonstrations will not be permitted in University areas outside of the Demonstration Areas." Ex. F at 1. The policy also prohibited advertising for events until registration was confirmed and provided for discipline for those who demonstrated without two working days' advance registration.

n.    "The Department of Public Safety provides a walking escort any time when requested, seven days a week." Ex. I at 1.

144.    Each of the provisions listed in the immediately preceding paragraph are all provisions that Columbia breached through its acts and omissions discussed above. Each breached provision constitutes an alternative theory of liability.

145.    Columbia failed to comply with these and other provisions of its policies and procedures by engaging in the acts and omissions above that subjected Plaintiffs to a hostile educational environment; sanctioned harassment, discrimination, and intimidation against Jonathan and David based on their Jewish identity; and treated Jonathan and David differently than other students because of their Jewish identity. Columbia's failure to comply with its own policies constitutes a breach of its

contractual obligations to Plaintiffs. Each breached provision constitutes an alternative theory of liability of breach.

146.    Columbia has also breached the implied covenant of good faith and fair dealing implied in its contracts with Plaintiffs. Among other things, Columbia selectively applied and enforced its policies and procedures in bad faith and in a way that discriminated against Plaintiffs based on their Jewish identity. Namely, Columbia treated incidents of assault, abuse, harassment, intimidation, and discrimination against Plaintiffs in a more lenient, tolerant, forgiving, and nonchalant manner than it treated similar incidents against students belonging to different protected classes.

147.    As a direct, proximate, and foreseeable cause of Columbia's breaches, Plaintiffs have been damaged in amounts to be determined at trial.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following relief in their favor and against Columbia:

1.    Declaration that Columbia violated Title VI of the Civil Rights Act of 1964 and New York City Administrative Code § 8-107.

2.    Declaration that Columbia breached its contractual obligations to Plaintiffs.

3.    Award of compensatory damages in an amount to be determined at trial.

4.      Award of punitive damages, as permitted by N.Y.C. Admin. Code § 8-502(a), in an amount to be determined at trial and in an amount sufficient to deter future unlawful conduct.

5.      Award of injunctive relief, including striking disciplinary or probationary marks from David's record.

6.      Award of reasonable attorneys' fees, costs, and expenses incurred in pursuing this litigation (including under 42 U.S.C. § 1988 and N.Y.C. Admin. Code § 8-502(g)).

7.      Grant of such other relief as the Court deems just and proper.

## JURY DEMAND

1.      Plaintiffs demand trial by jury on all issues so triable.

Respectfully submitted,

*/s/ Susan Greene*
Susan Greene (N.Y. Bar No. 4687349)
sgreene@holtzmanvogel.com
Jason Torchinsky*
jtorchinsky@holtzmanvogel.com
HOLTZMAN VOGEL BARAN TORCHINSKY
& JOSEFIAK PLLC
2300 N. St. NW, Suite 643
Washington, D.C. 20037
Phone: (202) 737-8808

Jonathan Lienhard*
jlienhard@holtzmanvogel.com
Daniel Bruce*
dbruce@holtzmanvogel.com
HOLTZMAN VOGEL BARAN TORCHINSKY
& JOSEFIAK PLLC
15405 John Marshall Highway

Haymarket, VA 20169
Phone: (540) 341-8808

\* *Pro Hac Vice* application forthcoming

*Counsel for Plaintiffs*